UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ANTOINE DEMETRIUS MEEKS, )<br>)<br>Defendant. ) | Case No. 4:06CR00461 RWS (AGF) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Antoine

Demetrius Meeks. Pretrial matters were referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress

evidence, alleging his arrest was unlawful. (Doc. #49). An evidentiary hearing was held

on October 20, 2006. The government was represented by Assistant United States

Attorney Antoinette Decker. Defendant was present and represented by his attorneys, N.

Scott Rosenblum and Adam Fein. At the hearing, the government presented the

testimony of Detective Quinn Turner, a Detective with the St. Louis County Police

Department (SLCPD). The witness was cross-examined extensively by defense counsel.

The parties were given leave to file post-hearing memoranda, after which the matter was

taken under submission.

Based on the testimony and evidence adduced and having had an opportunity to

observe the demeanor and evaluate the credibility of the witness, the undersigned makes

the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The investigation that gave rise to the arrest and seizure at issue in this case began on Monday, June 26, 2006, when Det. Turner received a call from a confidential source ("CS") about a person possibly involved in narcotics. Det. Turner has been a police officer for sixteen years. He was with the Jennings Police Department for four years, three years as a patrol officer and one year as a detective. Since that time he has been employed with the SLCPD, where he has been a detective for the past nine years. During his years as an officer and detective he has investigated and been involved in numerous drug investigations. He has also received specialized training in narcotics cases, including training focused specifically on the detection of hidden compartments used to transport drugs and drug proceeds, and has attempted to keep abreast of the trends. During his years as an officer and detective he estimated that he has found hidden drug compartments approximately 50-100 times.

On June 26, 2006, the CS advised Det. Turner that an individual named Jesus Leal, from Houston, Texas, had been staying at the Drury Hotel near the St. Louis airport, in room 511. When Leal arrived, he paid cash to stay one night, and then extended his stay for another night, again paying cash. Recognizing Houston as a source city for narcotics, and that drug traffickers often stayed near airports and paid cash for their hotel rooms, Det. Turner suspected that Leal might be involved in narcotics. At some point he ran Leal's name in the computer and tried to develop additional information. He did not

2

develop anything further from his computer check, and Defendant Meeks was not listed as a known associate.

Det. Turner went to the hotel to investigate, arriving in the afternoon, after checkout time. He first checked the parking lot, but did not see any vehicles with Texas plates that might belong to Leal. He went to the hallway outside room 511 and saw someone from housekeeping. The housekeeper knocked on the door and after receiving no answer, opened the door to the room. Because it was after checkout time and it appeared that Leal had checked out, Det. Turner asked the housekeeper if he could look around, and she allowed him to enter. The room was vacant, but inside he found an empty box of Bounce dryer sheets and a box of one gallon ziplock bags, with some bags remaining. Inside the box of dryer sheets was a receipt for a purchase, for cash, of one roll of duct tape and one box of Bounce on June 24, 2006, the first night of Leal's stay. The receipt was from a Home Depot store in North St. Louis County, at New Halls Ferry and Interstate 270, near the Castle Point neighborhood, approximately 10-15 miles from the hotel. Det. Turner had previously patrolled that area, and knew it to be a high crime neighborhood where there were a lot of robberies and drug-related activity and crimes. He also knew that this was not the Home Depot located closest to the hotel, and that one would pass by another Home Depot between the hotel and the store near Castle Point.

Based on his training and experience, Det. Turner knew the items found in the hotel room to be commonly associated with drug dealing. Dryer sheets are used to conceal the odor; ziplock bags are used to package narcotics and cash; and duct tape is

used to package, wrap and conceal narcotics and cash. In light of all of this information, Det. Turner believed Leal was involved in drug activity, but unable to locate Leal, he did not investigate the matter further at that time.

A few days later, on June 30, 2006, Det. Turner received information from a second confidential source that Leal had returned to the Drury Hotel. Det. Turner went to the hotel at approximately 3:00 or 4:00 p.m. and located a 2002 white Dodge pickup truck, with a Texas license plate,[1] parked in the front lot. He ran the plates and learned that the car was registered to Jesus Leal from Houston, Texas.

After locating Leal's car, Det. Turner contacted Dets. Sodoma and Hollocher to assist. The detectives conducted surveillance on the pickup and confirmed that Leal was still registered at the hotel. At approximately 6:00 that evening, an individual later identified as co-Defendant Leal approached the pickup.[2] Within a few minutes, a white Chrysler four-door sedan, with a Missouri license plate, approached and parked at the rear of the pickup. A male, later identified as co-Defendant David Diaz, got out and opened the trunk. Diaz and Leal then removed items from the trunk of the sedan and placed them in the pickup. The items removed were a hydraulic jack; approximately 6-8 pieces of 2x4 wood, cut in short sections of approximately the same length; and some

---

[1] The witness confirmed that his police report was in error to the extent it indicated it was a Missouri license plate.

[2] Det. Turner assumed the individual was Leal primarily from the fact he had approached Leal's pickup, but he had previously obtained a photograph of Leal in connection with the investigation.

PVC tubing, approximately 8-10' in length.  Based on his training and experience, Det. Turner suspected that the pickup might have a hidden compartment.  He knew it was common for couriers to use similar tools and items to access hidden compartments, and had previously seen hydraulic jacks and 2x4's used to access hidden compartments.  He had not previously seen PVC pipe used, but assumed the compartment might be in the gas tank.  Det. Sodoma, who is the SLCPD drug canine officer, agreed with Det. Turner's suspicions.

After placing the tools inside the pickup and the PVC piping in the truck bed, Diaz drove off in the sedan and Leal followed him in the pickup, proceeding eastbound.  Dets. Turner and Sodoma, who were dressed in plain clothes and each driving unmarked vehicles, followed.  They checked the license plate on the sedan and learned it was registered to a rental agency off Cypress Road, which is near the airport, and had been rented to David Diaz.

Leal and Diaz drove to a public storage facility located a few minutes away, in an industrial circle on World Parkway Circle, off of Natural Bridge.  Det. Sodoma stationed himself at the top of the circle and Det. Turner continued to follow the two vehicles.  At the entrance to the storage facility, Diaz opened the gate using a key pad, and he and Leal drove through, proceeding to unit #4 at the east end.  The gate to the unit was chained, and Diaz appeared to use a key to open a padlock.  He opened the bay door and Leal drove the pickup into the storage unit.  Leal then exited the unit, and they closed and locked the door, leaving the pickup inside.  Their actions in leaving the pickup – with the

tools – inside the storage unit, heightened the detectives' suspicions that the two were engaged in narcotics activity.

Leal got into Diaz's sedan, and they drove up World Park Circle and headed west on Natural Bridge. Det. Hollocher continued to maintain surveillance on the storage locker, while Det. Sodoma remained near Natural Bridge. Det. Turner attempted to follow Leal and Diaz, but lost sight of the sedan.

Approximately 20 - 30 minutes later, the white sedan returned, with Diaz driving and Leal in the passenger seat. It was now between approximately 6:00 and 6:45 p.m. and was still light outside. The sedan pulled up to the gate and Leal got out. Det. Turner noticed that he was now wearing a white t-shirt, rather than the multi-colored shirt he had previously been wearing. Leal was looking at Diaz, as though he was listening to something. He entered the code, which raised the gate, and then walked back to the car, where he appeared to have a conversation with Diaz. Rather than enter the storage facility, they drove around the corner to where a transport business was located. At that point, Leal got out of the car and Diaz drove off.

Det. Turner followed Diaz's sedan as it proceeded westbound on Natural Bridge, toward the hotel. As he was following Diaz, he was contacted by Det. Hollocher who advised him that Leal had returned to the storage unit. Det. Turner decided to return to the storage unit, thinking they were going to move the drugs he believed were in the pickup. Det. Hollocher then called again and advised him that Leal had been talking on a cell phone and looking around in front of the open door to the storage unit, but he then

shut the storage door, locked it, and walked off. Det. Hollacher advised Det. Sodoma to watch for Leal, but he did not see Leal come his way. When Det. Turner arrived, he drove around and looked for Leal, but did not find him.

Approximately 20 minutes later, at about 7:00 or 7:30 p.m., Det. Turner returned to the hotel parking lot and saw Diaz's rented white sedan, parked in the same spot in which the pickup had been parked earlier. He did not see anyone in the car, and drove back to where the detectives were conducting surveillance on the storage unit.

At approximately 10:30 p.m., a red Pontiac four-door Grand Am drove up with three people inside. The occupants opened the gate to the facility and drove to the bay door of the storage unit. The detectives saw Diaz get out of the Pontiac, remove the padlock and open the door to the storage unit. Leal, who had also been a passenger in the Pontiac, walked quickly into the storage unit and then drove the pickup out of the unit. Diaz returned to the red Pontiac, which drove out of the storage facility, and Leal followed behind in the pickup truck.

The red Pontiac was able to enter onto Natural Bridge more quickly than the pickup, and it appeared as though the Pontiac was waiting for the pickup. The Pontiac had slowed, started to pull over, and then proceeded when the pickup caught up to it. The detectives were able to follow the two vehicles, which traveled west on Natural Bridge, onto Interstate 70, and then north on I-270. The two vehicles drove to New Halls Ferry Road and then headed east on Pershall Road, which is a service road, to Landseer. They had traveled on the highway for approximately 15-20 minutes, and on the streets for

another 5-10 minutes. They were now in North St. Louis County, near the Home Depot where the duct tape had previously been purchased, approximately 15-18 miles from the storage facility.

When he saw they were heading toward this area of North County, Det. Turner contacted the 1st Precinct and requested a marked car for a possible traffic stop. He wanted to stop the vehicles, if possible, on the road, as he was concerned that if they entered a garage he would no longer be able to observe what was going on. The red Pontiac and the pickup slowed as they approached a T-intersection at Landseer and Langford, and then both vehicles stopped in the middle of the intersection, illegally blocking the intersection. After observing the vehicles block the intersection, Det. Turner instructed the marked unit to stop the pickup for the traffic violation. Turner also believed the pickup contained contraband, and wanted to conduct further investigation, although he did not take the time to explain this to the uniformed officer.

Officer Woodall, the uniformed officer who was driving the marked vehicle, activated his lights and siren and curbed the pickup, which was behind the Pontiac. As Officer Woodall activated his lights, the red Pontiac made a U-turn and headed back up Landseer, at a rate of speed that Det. Turner believed exceeded the speed limit. Det. Turner instructed Det. Hollocher to assist the uniformed officer with the stop of the pickup truck, and he and Det. Sodoma followed the red Pontiac in their unmarked cars. As he was catching up to the red Pontiac, Det. Turner determined from his own speed that the Pontiac was driving at 45-50 miles per hour, which exceeded the 25 mile per hour

speed limit.  Det. Turner saw that a black male, later identified as Defendant Antoine

Meeks, was driving the Pontiac, with a Hispanic male passenger, believed to be Diaz.

Det. Turner called the 1st Precinct for another marked car to conduct a traffic stop of the

Pontiac for excessive speed, as he did not have the capability to make a traffic stop in his

own unmarked car.

A patrol officer arrived, used his lights and siren to stop the Pontiac, and then

advised Det. Turner he had made the stop.  Det. Sodoma went to assist with the stop

while Det. Turner returned to where Leal and the pickup had been stopped.  Det.

Hollocher had spoken with Leal, who spoke English well, and he related Leal's

statements to Det. Turner when he arrived.  Leal stated that he was looking for a

Walgreens and was lost.  He denied that he had been following or driving in tandem with

anyone, which the detectives knew to be untrue.  Det. Turner questioned him further and

Leal said that he lived in Houston and had come to St. Louis to visit the casinos.  When

asked why he was looking for a Walgreens, he said he wanted to purchase cold medicine.

He further stated that it was the first time he had ever been to St. Louis, which Det.

Turner also knew to be untrue.  At some point, on his own initiative, Officer Woodall

issued a ticket to Leal for blocking the intersection.

The detectives asked for consent to search the pickup, and Leal agreed.  Inside the

cab of the pickup, they observed the jack and the other items they had previously seen

Leal and Diaz place inside truck, as well as a rachet, socket wrench, extension, and other

tools, but they did not find any contraband.  The PVC pipe was also still in the bed of the

truck. Det. Turner crawled under the pickup and used his flashlight to check the gas tank, but did not find anything there. The frame of the pickup was enclosed, with factory holes drilled through it. He looked through one of the holes, and saw what appeared to be black tape. He put his finger through the hole and felt a brick-like package, which he could move with his finger. Based on his training and experience, he believed the package to contain narcotics, and he instructed Officer Woodall to arrest Leal for the possession of narcotics.

After the search, which took between 10-15 minutes, Det. Turner called Det. Sodoma and asked what had occurred at the stop of Meeks' car. Det. Sodoma advised him that he had spoken to Defendant Meeks and to Diaz, who both spoke English well, and that both suspects denied that they were with others or that any vehicle was following them. Their stories were also somewhat inconsistent with one another. Meeks said he and Diaz met at a nightclub less than one year ago and were going to a party, whereas Diaz said he and Meeks had met at a club four months ago, and that Meeks was taking him to meet a girl, but he did not know where. Det. Sodoma also advised Det. Turner that he saw a silver padlock on the floor of the red Pontiac, near Diaz's feet. Det. Turner advised Det. Sodoma what he had found, and after hearing Det. Sodoma's report, he instructed Det. Sodoma to arrest both individuals.

The officer who effected the arrest of Defendant Meeks noticed a large lump in Defendant's pant pocket and asked about it, but there was no testimony regarding his

response.  After it was seized, it was determined to be a large stack of currency.[3]

Following their arrests, uniformed officers transported Meeks, Diaz and Leal to the 1st Precinct.  Another uniformed officer drove the pickup to the precinct, where the detectives examined it further.  Det. Turner observed that there were tool marks on the bolts that held the frame to the cab, and he determined that the tools found inside the truck were the correct size for the bolts.  He removed the bolts and could feel that there were slots cut out at the top of the frame.  By placing the jack on the 2x4's, they were able to raise the frame and access the packages.  There was a slot cut out on each side of the frame, and Det. Turner was able to remove a bundle from each slot.  By shoving the PVC pipe into another hole, they were able to force other packages up from the sides and retrieve them from the two slots.  In total, using all of the tools they had located in the pickup, they retrieved 9 kilogram packages of cocaine from the frame of the pickup, four from one side and five from the other.

While they were searching the pickup, other officers booked and processed the three suspects and Det. Hollocher began to interview them.  Following the search of the pickup, Det. Sodoma had his canine, Scooter, search the area outside the truck where the drugs were located, and also the interview room where Meeks and the cash were located,

_____

[3] It is not clear whether the currency was seized at the scene or later at the precinct.  Although Det. Turner believed that the officer may have conducted a pat-down search, he was not sure, and the government offered no further evidence.  The government confirmed that it is not contending that the cash was seized pursuant to a pat-down search, as opposed to an arrest.  The parties agreed that for purposes of this motion the Court should assume the seizure occurred pursuant to Defendant's arrest.

and the canine alerted to both the cash and the cocaine.  Dets. Turner and Hollocher counted the currency, two times, in front of Defendant Meeks.  It was a large stack of bills, of various denominations, totaling $9,539.  Defendant made no comments as they counted the currency.  One or more of the co-defendants made statements, but Defendant Meeks declined to make any statement to the detectives.

## CONCLUSIONS OF LAW

### A.  Probable Cause for Arrest

Defendant's motion to suppress turns on a single legal issue: whether the detectives had probable cause to arrest Defendant.  As an initial matter, the Court notes that the officers had reasonable cause to stop Defendant's car for the two traffic violations Det. Turner had observed:  blocking the intersection and speeding on Landseer.  When a police officer observes a traffic violation –  however minor – he has probable cause to stop the vehicle.  Whren v. United States, 517 U.S. 806 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005).  That the detectives may also have had other investigative purposes in effecting the stop does not undermine the legality of the stop, where as here, the police had probable cause to stop the vehicle for traffic violations.  United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) ("If the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop.") (quoting United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990); accord United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (traffic

violation creates probable cause for stop, even if valid traffic violation is a pretext for other investigation); United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996) (traffic stop supported by probable cause was valid even if police would have ignored traffic violation but for suspicion that greater crimes were afoot).

The detectives also had reasonable suspicion to detain all three suspects for further investigation. Police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 499 U.S. 411, 418 (1981)).

Detective Turner, who had extensive training and experience in narcotics investigations and concealed compartments, had reason to believe that Leal was engaged

in drug trafficking based upon the fact he traveled to St. Louis from a source city, paid cash for his room, and left items associated with the packaging or concealment of narcotics in his hotel room. His suspicions were further confirmed when Leal returned several days later, met Diaz, who was driving a rental vehicle, and they transferred items into the pickup truck that a trained officer recognized as associated with concealed compartments. They then secreted the pickup in a storage facility, which was followed by further suspicious comings and goings to and from the storage unit. By this time, the detectives had more than a reasonable basis to believe that Leal and Diaz were engaged in some form of drug trafficking that involved the pickup in the storage unit.

A few hours later, Meeks drove Leal and Diaz to the storage unit, even though Diaz had his own car at the hotel. Meeks waited at the storage unit while Leal retrieved the pickup from the locked storage unit, and he and Diaz then waited for Leal to catch up to them as they exited the storage facility. Leal then followed Meeks for twenty to thirty minutes, to the area near where Leal had originally purchased the duct tape and dryer sheets, where they stopped, late at night, in the middle of the intersection. In light of all of these facts, the Court finds that there was reasonable suspicion for conducting an investigative stop of both vehicles related to possible narcotics violations involving the pickup. See United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir.) (reasonable suspicion for Terry stop where officers, in area known for drug activity, saw individual entering defendant's car after same individual had been seen conducting probable drug transaction with another car a few minutes earlier), cert. denied, 545 U.S. 1109 (2005);

United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence police were searching for methamphetamine lab and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Gonzalez, 220 F.3d 922, 925 (8th Cir. 2000) (reasonable suspicion of drug transport based on accomplice's information, including particulars of vehicle and direction of travel).

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" Bloomfield, 40 F.3d at 915 (quoting Cummins, 920 F.2d at 502). The law is also clear that when "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" United States v. Johnson, 58 F.3d 356, 357 (8th Cir.), cert. denied, 516 U.S. 936 (1995) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)). Here, Leal made at least two material statements to the detectives that they knew to be untrue: he denied having been to St. Louis previously and denied he was driving with another vehicle. Meeks and Diaz also gave somewhat conflicting statements about the purpose of their travel, and both falsely denied driving with another vehicle. While officers may not extend the stop any longer than is necessary to address their reasonable suspicions, the stop here took only 10-15 minutes, and was not longer than was necessary to pursue the investigation with respect to all three individuals.

See United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006) (holding that "the officers could not dispel their suspicions that had prompted the Terry stop until they transported [the defendant] back to the bank for the show-up identification").

While Defendant does not contest that the detectives had reasonable suspicion for a Terry stop, he argues they never acquired probable cause, asserting that Defendant easily could have been an innocent participant. The Court finds otherwise.

Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001); accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir.), cert. denied, 510 U.S. 883 (1993) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Officers are not required to rule out all innocent explanations, nor are they required to be able to prove a case beyond a reasonable doubt to effect a warrantless arrest. Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("the probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances"); Illinois v. Gates, 462 U.S. 213, 235 (1983) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision."). As the Eighth Circuit has observed, "We assess probable cause from the viewpoint of a reasonably prudent police

officer, acting in the circumstances of the particular case. We remain mindful that probable cause is a practical, factual, and nontechnical concept, dealing with probabilities." United States v. Crossland, 301 F.3d 907, 911 (8th Cir. 2002). Moreover, in "[m]aking this determination, the court may consider the collective knowledge of all others involved." United States v. Morgan, 997 F.2d 433, 435 (8th Cir. 1993); United States v. Rich, 795 F.2d 680, 682 (8th Cir. 1986).

At the hearing, Defendant suggested that Meeks and the others could simply have been engaged in innocent social activities. As set forth above, however, the police are not required to rule out all innocent explanations to establish probable cause, and in any event, the facts here did not suggest innocent activity. For example, if the three suspects were engaged in nothing more than a social interaction, they had little reason to retrieve the pickup that Leal and Diaz had taken such great pains to move from the hotel parking lot to a locked storage facility just hours before, and drive in tandem for at least twenty minutes toward their destination. Moreover, when the uniformed officer pulled over the pickup, Meeks did not wait there, as one would expect of an innocent friend, but rather made a U-turn and drove off quickly.

In his post-hearing memorandum Defendant relies heavily on United States v. Everroad, 704 F.2d 403 (8th Cir. 1983), for his assertion that probable cause was lacking, arguing that the facts here support nothing more than Defendant's "mere association with individuals suspected of narcotics activity." Doc. #71, at 11. In Everroad, the Eighth Circuit held that probable cause was lacking where, shortly before a narcotics transaction,

the defendant had driven the individual involved in the transaction to the hotel where the

defendant was staying. The individual involved in the drug transaction thereafter advised

the undercover purchaser that the narcotics could be delivered within 30 minutes, and

defendant's hotel was located within a 30-minute drive of the location of the transaction.

The Court, in a 2-1 decision, held that "physical proximity to a crime combined simply

with a brief association with a suspected criminal – when there is no other unlawful or

suspicious conduct by any party involved – cannot support a finding of probable cause."

Id. at 407.

This case is easily distinguishable from Everroad, however, as the facts show more

than Defendant's brief association with other individuals suspected of narcotics activity.

Rather, this case is more like those cases that have distinguished Everroad and found

probable cause. See  United States v. Caves, 890 F.2d 87, 94-95 (8th Cir. 1989) (finding

probable cause to arrest passenger of car where odor of marijuana was detected on driver,

passenger and driver appeared to have traveled together from out of state, passenger's

luggage was in trunk where metal sheet concealed hidden compartment, and driver

demonstrated trust of passenger by leaving keys in ignition and asking passenger to

retrieve insurance papers from glove compartment); United States v. Myrick, 1997 WL

564673, at *12-13 (N.D. Ill. 1997) (finding probable cause to arrest defendant, passenger,

where car in which defendant was riding drove individual associated with drug package

to BMW, where drug package was located; followed closely behind BMW for one mile;

and then fled from police when officers conducted traffic stop of BMW); see also United

States v. Dennis, 1990 WL 193223, at *5 (4th Cir. 1990) (unpub.) (probable cause to arrest occupants of second car, where seller told undercover agent he would need to page supplier, second car thereafter arrived, seller walked over to second car, and second car then followed seller and agent a lengthy distance to the sale site).

Here the detectives observed Defendant drive Leal and Diaz to retrieve the pickup from where it had been secreted in a storage facility, just hours before. Leal then followed Defendant Meeks as they drove, in tandem, for more than twenty minutes, late at night, to an area near where Leal had purchased the narcotics-related items previously found in his hotel room. When Leal was pulled over by a uniformed officer, Meeks – who would have observed no other patrol cars at the site – made a U-turn and quickly drove off. Thereafter, Leal made several false statements to the detectives, including a denial that he was driving with another vehicle; Meeks and Diaz gave somewhat conflicting stories about the purpose of their journey to Det. Sodoma; and more significantly, Meeks and Diaz both denied that they were with anyone else or were driving with another vehicle, which the detectives knew to be untrue. Once Det. Turner discovered what was reasonably believed to be narcotics hidden above the frame of the pickup, a reasonably prudent officer, specially trained in narcotics and in detecting hidden compartments, would reasonably have believed that all three suspects, including Defendant Meeks, were engaged in drug trafficking. See United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause where defendant appeared to be providing surveillance for another individual officers had cause to believe was engaged in narcotics

transactions; defendant's "actions and behavior, although perhaps seemingly innocuous to the general public, were reasonably suspicious to officers trained to recognize behavior consistent with those of a lookout for a drug deal"); see also Bustos-Torres, 396 F.3d at 943 (finding that where officer, with specialized training in narcotics, observed individual conduct suspected hand-to-hand transaction with driver of car that drove up, in parking lot in area known for drug traffic, and within minutes defendant drove up and individual now suspected as dealer entered car, officer, upon finding what he believed to be large wad of bills during pat-down search, had probable cause to arrest defendant).

### B. Search of Defendant

After placing Defendant under arrest, the officers were entitled to search Defendant incident to his arrest. See New York v. Belton, 453 U.S. 454, 458-59 (1981); United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Pratt, 355 F.3d 1119, 1121, 1124 (8th Cir. 2004). As such, neither the currency or any other items located on Defendant's person are subject to suppression.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. #49] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections

may result in a waiver of the right to appeal questions of fact. See <u>Thompson v. Nix</u>, 897

F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 21st day of November, 2006.